UNITED STATES BANKRUPTCY COURT
DISTRICT OF MAINE

|  |  |
|---|---|
| In Re:<br><br>BARBARA S. ERKSON,<br><br>Debtor. | Chapter 13<br>Case No. 16-20169 |
| BARBARA S. ERKSON,<br><br>Plaintiff,<br><br>v.<br><br>UNITED STATES DEPARTMENT OF<br>EDUCATION and EDUCATIONAL<br>CREDIT MANAGEMENT<br>CORPORATION,<br><br>Defendants. | Adversary Proceeding<br>Case No. 16-02018 |

## **MEMORANDUM OF DECISION**

By this adversary proceeding, Barbara S. Erkson (the "Plaintiff") seeks to discharge under

11 U.S.C. § 523(a)(8)[1] certain loan obligations she owes to the United States Department of

Education (the "DOE") and Educational Credit Management Corporation ("ECMC").[2]    An

evidentiary hearing took place on September 11, 2017, during which the Plaintiff was the sole

witness.    The matter was taken under advisement following the hearing.    Upon review of the

evidence submitted by the parties, and for the reasons set forth below, judgment will be entered

---

[1] References to statutory section numbers are to the Bankruptcy Reform Act of 1978, as amended, at 11 U.S.C. § 101 *et seq.* (the "Code").

[2] The Plaintiff originally named the following entities as defendants: Nelnet Education Planning & Finance, Rhode Island Higher Education Assistance Authority, the DOE and Vermont Student Assistance Corporation.    By order dated August 26, 2016, ECMC was substituted for Defendants Rhode Island Higher Assistance Authority and Vermont Student Assistance Corporation.    Default Judgment entered against Nelnet Education Planning & Finance on June 5, 2017, leaving the DOE and ECMC as the only two remaining defendants.

against the DOE and ECMC, and the Plaintiff's student loan indebtedness owed to them will be discharged.

## I.     Jurisdiction and Venue.

This Court has jurisdiction over the subject matter and the parties pursuant to 28 U.S.C. §§ 157(a) and 1334 and the United States District Court for the District of Maine Local Rule 83.6(a). This is a core proceeding under 28 U.S.C. § 157(b)(2)(I).  Venue here is appropriate pursuant to 28 U.S.C. §§ 1408 and 1409.

## II.     Background.

*A.  Education and early career.*

The Plaintiff is a sixty-four-year-old single woman with no dependents.  In 1998, the Plaintiff commenced studies at Vermont College of Norwich University where she obtained a Bachelor of Arts in Interdisciplinary Studies with the goal of becoming a counselor.  She incurred student loan debt in connection with those studies. The Plaintiff testified that sometime during her undergraduate program at Vermont College, she was diagnosed with a hearing impairment.  She further testified that, although she understood the condition to be progressive in nature, it was not possible at the time to know how much her hearing would deteriorate in the coming years.

After graduating from Vermont College in 2002, the Plaintiff worked at various community agencies in order to obtain the conditional licenses necessary to work as a Licensed Clinical Professional Counselor ("LCPC") and Licensed Alcohol and Drug Counselor ("LADC") in her chosen field of community mental health.  Those internships paid very little and, although the Plaintiff managed to make some payments on her undergraduate student loans, she eventually negotiated a reduced payment schedule.  Notwithstanding this relief, the Plaintiff was unable to make regular payments and she soon defaulted on the modified payment terms.

From 2002 until 2008, the Plaintiff worked for Counseling Services, Inc. ("CSI").  Her position there was terminated in 2008 when CSI ended a number of programs due to funding constraints.  The Plaintiff's subsequent job search proved largely unsuccessful.  With her hearing impairment continuing to worsen, and already in default on her undergraduate loans, the Plaintiff enrolled in Salve Regina University, where she obtained a Master of Arts in Holistic Counseling in 2011.  The Plaintiff financed her graduate studies through more student loans.  The outstanding balance on the graduate and undergraduate loans currently exceeds $107,000.00 and it is this indebtedness which the Plaintiff seeks to discharge in this proceeding.[3]

The Plaintiff immediately found full-time employment following her graduate studies.  First, she worked for Southbay Mental Health in Weymouth, Massachusetts as an adult outpatient, fee-for-service clinician. In 2012, the Plaintiff returned to Maine to be closer to her family and was rehired by CSI as a Community Case Integration Manager.  The following year she transferred to CSI's Assertive Community Treatment ("ACT") team as a case manager.  CSI then merged with Maine Mental Health Partners which ultimately became Maine Behavioral Healthcare ("MBH").

The Plaintiff continued in her role as an ACT case manager post-merger until September 2014 when she was hired to run a new peer support program for MBH called Wellness Integration in a Supportive Environment ("WISE").  The program was designed for adults, forty years of age and older, with persistent mental health issues and/or co-occurring disorders.  The Plaintiff lead groups, developed curriculum, taught art therapy, acted as a liaison with allied providers, and directed and supported clinical interns.  In addition, the Plaintiff maintained a small case load of individual adult clients receiving mental health and substance abuse treatment services for MBH.

---

[3] The parties stipulated that, as of August 16, 2017, the Plaintiff owed DOE $59,074.80, plus daily interest of between $4.16 and $4.75 accruing from that date.  The parties further stipulated that, as of August 27, 2017, the Plaintiff owed ECMC a total of $48,476.28.

*B. Crossroads.*

In April 2016, the State of Maine eliminated the funding for the WISE program and the Plaintiff's position was cut.  MBH offered her another clinical position but soon rescinded that offer after realizing that, under applicable laws and regulations governing Medicare reimbursements, services provided by LCPCs—unlike those provided by Licensed Clinical Social Workers ("LCSWs") — were then, and currently still are, ineligible for Medicare reimbursement.  Since the Plaintiff, an LCPC, could not provide reimbursable services to MBH's large population of Medicare recipients, MBH placed her in an administrative, rather than a clinical, role.

The Plaintiff testified that her administrative duties required frequent use of the telephone, which was very difficult due to her hearing loss.  These challenges, coupled with her desire to use her degree, led the Plaintiff to leave MBH at the end of March 2017 and join Crossroads—an agency providing addiction and behavioral health treatment—as a fee-for-service clinician.  In this, her current position, she counsels adults who are suffering from addiction, mental health issues or co-occurring disorders.  The majority of her clients are marginalized, low-income, individuals; many of whom do not reliably attend scheduled counseling sessions.

According to the Plaintiff, Crossroads schedules counseling sessions, processes the insurance claims, and issues invoices. The Plaintiff submits a timesheet to Crossroads every two weeks and is paid the following week.  She works three days a week and is reimbursed at a rate of $45 per hour for counseling sessions which are actually attended by clients.  In other words, if a client fails to appear for a session, the Plaintiff is not paid for that session. Although her three-day per week schedule allows for fifteen to twenty counseling sessions per week, the most patients she has ever seen in a week is twelve or thirteen and, as of the date of the trial, it had been some time

since she had seen even that many.  Some weeks she sees as few as six clients and, during at least one week, she saw only three.

   *C.  Private practice.*

   In addition to her employment at Crossroads, the Plaintiff joined several former co-workers in opening their own private practice in February of 2017.  This practice is affiliated with Sweetser which handles all of the Plaintiff's administrative paperwork and provides some referrals.  She shares office space in Saco, Maine with four full-time and three per diem, part-time professionals. The Plaintiff sees an average of ten to twelve clients per week in her private practice but some weeks she sees as few as six clients.  Her private practice is similar to her employment at Crossroads in that she is only paid for counseling sessions her clients actually attend but, unlike her Crossroads practice, the Plaintiff must also reimburse Sweetser for any counseling fees she receives and for which insurance coverage is subsequently denied.  These denials may be based on the scope of coverage, a lapse in coverage or termination of a policy.  Unlike Crossroads, where the Plaintiff is paid for services bi-weekly, the delay between her submission of an invoice to Sweetser and receipt of payment can be anywhere between two weeks to more than a month.

   The Plaintiff currently devotes two full weekdays to her private practice, as well as some Saturdays, but hopes to eventually transition to full-time private practice.  To that end, she maintains a monthly online presence on Psychology Today's website and is taking other steps to build her practice.  While the Plaintiff remains hopeful that she can build a sustainable practice, she believes several factors will continue to limit her economic prospects. For instance, as an LCPC, her services are not reimbursable under Medicare.[4]  The Plaintiff also testified that her

---

[4] The Plaintiff testified at trial that these rules and regulations were not in place when she obtained her degrees.  She further testified that these developments, along with other changes to insurance, including the curtailment of programs and tighter restrictions on reimbursement rates, have substantially diminished an LCPC's earning potential.

hearing impairment has progressed to bilateral severe and profound hearing loss and that, even with the aid of adaptive hearing equipment, it is extremely difficult for her to counsel patients suffering from physical ailments which impact speech—a common occurrence among clients with the addiction and mental health issues in which she specializes. The Plaintiff can sometimes work with a client who mumbles, slurs or stutters if she is able to read lips but lip reading is not always possible depending on the severity of the condition, as well as other factors, such as the client's willingness to look at her when speaking and the existence of facial hair.

D. *Net income upon filing for bankruptcy relief.*

Various pictures of the Plaintiff's net income have been presented and all show that her finances are strained. For example, when she filed for bankruptcy relief on March 30, 2016, her schedules reflected a monthly deficit of $263.49. Her schedule I indicated monthly gross income from MBH in the amount of $3,188.90. After standard payroll deductions, and deductions for voluntary retirement plan contributions, insurance, health savings account contributions, a student loan garnishment and life insurance premiums, the Plaintiff was, at the time of filing, left with monthly take-home pay of $1,845.51. Schedule J reflected monthly expenses totaling $2,109.00, which expenses included, among others, $850.00 in rent, $350.00 in transportation expenses, and $400.00 in food and housekeeping expenses.

E. *Net income based on supplemental discovery responses and trial testimony.*

Later, in August of 2017, the Plaintiff supplemented prior responses to interrogatories and requests for production of documents to provide more current information regarding her income and expenses following her transition from MBH to Crossroads and private practice.[5] Her

---

[5] The Plaintiff was not required to file the updated Schedules I and J reflecting post-petition changes in income and expenses with the Court because the underlying bankruptcy case is a case under chapter 7 of the Bankruptcy Code. In his closing arguments, counsel for the DOE argued that the Plaintiff did not provide any evidence to establish her current ability to pay student loans and asserted that the Court should not consider the amended Schedules I and J

amended Schedule I reflects an increase in her monthly take-home pay to $2,213.39 from her

original Schedule I net income of $1,845.51.  The monthly take-home pay is comprised of two

components.  First, by averaging the income she received in her first four months of employment

by Crossroads, she determined that her average monthly take-home pay from that agency is

$1,765.00 ($2,109.00 gross income less $344.00 in tax, Medicare and social security deductions).

Second, the Plaintiff determined she earns an average of $448.39 per month from her private

practice.  She computed this figure by averaging the gross income of her first six months or so of

private practice and then subtracting $300.00 for office rent, $40.00 for office utilities and $291.00

for the deductions on a reimbursement claim owed to Sweetser.  By adding these two sources of

income together, the Plaintiff determined her average monthly income to be $2,213.99.

Although this method of computing the Plaintiff's average monthly income is not patently

unreasonable, this Court is concerned that it understates her current monthly income.[6]  Adjusting

the Plaintiff's average monthly income from private practice to exclude her first two months as

outliers and to include a project monthly income of $1,500.00 for August, her sixth month of

private practice, her average gross monthly income derived from her private practice would equal

$1,435.80.  After deducting the $340.00 in office rent and utilities associated with the new practice

---

because they are not sworn schedules.  This Court disagrees.  The amended schedules were attached as an exhibit to
the Plaintiff's sworn supplemental discovery responses.  Those responses, and the exhibits thereto, were admitted into
evidence as Joint Exhibit 7 by agreement of the parties and without reservation or limitations.  Further, during cross-
examination, counsel for both the DOE and ECMC asked the Plaintiff to address a number of specific line items in
the amended Schedules I and J and Plaintiff's own counsel followed up with additional questions on redirect
examination regarding other line items.  As a result, the Plaintiff testified under oath to most, if not all, of the content
of those two documents. Based on the foregoing, this Court finds that amended Schedules I and J are fully incorporated
into the evidentiary record.

[6]  She earned $203.05 and $784.92 in March and April of 2017, respectively, compared to $1,307.64, $1,578.21, and
$1,357.35 in May, June and July of 2017.  In addition, the Plaintiff indicated in her supplemental discovery responses,
submitted on August 23, 2017, that her income from private practice from August 1, 2017 "to date" was $1,197.16.
Accordingly, the August income figure does not reflect a full month of work.

and adding the Crossroads income of $1,765.00, the Plaintiff's monthly income increases from the $2,213.39 shown in the amended Schedule I to $2,860.80.

The $2,860.80 figure does not include the $261.00 per month the Plaintiff had been paying to Sweetser.  Although the Plaintiff testified that, at the time of the trial, the current reimbursement claim reflected on the amended Schedule I was almost paid in full, she also anticipated having to commence payments soon thereafter on another $500.00 reimbursement claim at the same rate of $261.00/month.  At that time, no further reimbursements were immediately on the horizon, but the fact that the Plaintiff incurred liability for two reimbursement claims in just six months of private practice suggests that such claims are common in this line of work.  If reimbursement payments are a regular occurrence, the Plaintiff's average monthly income may be closer to $2,599.80 than $2,860.80.  Based on this analysis, the Court finds that the Plaintiff's current average monthly income falls somewhere between $2,213.39 and $2,860.80.

Having fixed, as best it can, the Plaintiff's income, the Court now turns to the Plaintiff's expenses as shown in her amended Schedule J.  Perhaps the biggest change in the Plaintiff's expenses is the appearance of a new car lease.  After the engine in her ten-year-old car failed post-petition, the Plaintiff entered into a lease on a Subaru Forester pursuant to which she pays $319.00/month.  In addition to the car payments, amended Schedule J shows a monthly expense of $195.00 for a dog walker because her new job at Crossroads precludes her from going home at noon to walk the dog she depends on for assistance.  The Plaintiff testified that her hearing impairment makes it difficult for her to hear the smoke detector, the phone and the doorbell.  Ambient noise in public places exacerbates her hearing difficulties and can pose a safety concern.  The Plaintiff relies on her dog in many situations to help her go about her daily activities safely and with some measure of efficiency.  Finally, her monthly rent for her two-bedroom apartment in

Biddeford, Maine increased from $850.00 to $950.00 on September 1, 2017. In all, the Plaintiff's monthly expenses shown on amended Schedule J total $2,940.00.

If the Plaintiff's monthly income is the $2,213.39 reflected on amended Schedule I, then her expenses outstrip her earnings every month by $726.61. That monthly deficit shrinks to $79.00 if the $2,860.80 figure is closer to the Plaintiff's actual monthly income. For months in which the Plaintiff is required to reimburse Sweetser on an insurance claim, her monthly deficit would be approximately $340.20.

The Court further notes that the Plaintiff's original schedules included a $104.30 deduction every month for health insurance. The amended Schedule I does not include any such deduction because the Plaintiff does not now have health insurance. Although the amended Schedule J captures $175.00/month in medical and dental expenses that did not appear on the original Schedule J, these funds are insufficient to cover anything more than the most basic medical and dental costs. Any one of a variety of common medical events or ailments could result in out-of-pocket expenses substantially beyond those budgeted in the amended Schedule J.

F.    *The Plaintiff's future income.*

The Plaintiff also testified at trial that she always expected to work until she was seventy years old but that physical ailments may preclude her from doing so. In addition to her hearing impairment, she claims that she suffers from chronic pain and discomfort associated with fibromyalgia and irritable bowel syndrome. The Plaintiff is projected to receive $1,640.00 per month in social security income if she works until the age of seventy but if she stops working earlier, her social security income would be approximately $1,240.00 per month. The Plaintiff has a 403(b) account with Lincoln Financial—her sole retirement fund—but that account contains approximately $2,200.00 after the Plaintiff withdrew $6,933.00 in 2016 to make a down payment

on the Subaru Forester and pay necessary medical expenses.  Her two savings accounts contained

approximately $200.00 and $700.00, respectively, at the time of trial.

### III.     Positions of the Parties.

The Plaintiff urges this Court to stay the course and employ the "totality of the

circumstances" test it has adopted in prior cases.  Under that test, the Debtor is required to "prove

by a preponderance of the evidence that (1) . . . [her] past, present, and reasonably reliable future

financial resources; (2) . . . [her] and . . . [her] dependents' reasonably necessary living expenses;

and (3) other relevant facts or circumstances unique to the case, prevent [her] from paying the

student loans in question while still maintaining a minimal standard of living . . ." Bronsdon v.

Educ. Mgmt. Corp. (In re Bronsdon), 435 B.R. 791, 797 (1st Cir. B.A.P. 2010) citing In re Lorenz,

337 B.R. 423, 431 (1st Cir. B.A.P. 2006).

The Plaintiff contends that her modest expenses entirely consume her income such that

the application of the "totality of circumstances" test warrants a finding of undue hardship.  She

further argues that medical expert testimony is unnecessary to prove that medical and physical

conditions impair her ability to increase her income, or that those conditions will continue and

even worsen with the passage of time.  Finally, she rejects the notion that her failure to apply for

or participate in an income contingent repayment plan ("ICRP") evidences a lack of good faith

thereby disqualifying her from a hardship discharge of her student loans.

While conceding that this Court is likely to apply the "totality of the circumstances test"

established in Bronsdon, the DOE and ECMC suggest that the Brunner test is more appropriate.

Under that test, a debtor must show: "1) that the debtor cannot, based on current income and

expenses, maintain a 'minimal' standard of living for himself or herself and his or her dependents

if forced to repay the loans, 2) that this state of affairs is likely to persist for a significant portion

of the repayment period of the student loan, and 3) that the debtor has made good faith efforts to

repay the loans." In re Brunner, 46 B.R. 752, 756 (S.D.N.Y. 1985), aff'd sub nom, Brunner v. New

York State Higher Educ. Services Corp., 831 F.2d 395 (2d Cir. 1987).

The DOE and ECMC argue, however, that the Plaintiff has not met her burden under either

test and, therefore, that she is not entitled to a hardship discharge regardless of which standard the

Court employs.  In his closing argument, counsel for the DOE maintained that the Plaintiff failed

to provide any reliable or credible evidence of her current or future income and expenses and,

therefore, that she did not meet her burden under the first and second prongs of the "totality of the

circumstances" test.  The DOE and ECMC further assert that the Plaintiff's failure to present expert

medical testimony is fatal to her claim that her hearing impairment and other medical and physical

conditions currently limit, and will continue to limit, her ability to maintain a "minimal" standard

of living.

In addition, the DOE and ECMC urge this Court to consider other factors under the third

prong of the "totality of the circumstances list."  They include:

(1) Total incapacity now and in the future to pay one's debts for reasons not within the
    control of the debtor.
(2) Whether the debtor has made a good faith effort to negotiate a deferment or forbearance
    of payment.
(3) Whether the hardship will be long-term.
(4) Whether the debtor has made payments on the student loan.
(5) Whether there is permanent or long term disability of the debtor.
(6) The ability of the debtor to obtain gainful employment in the area of study.
(7) Whether the debtor has made a good faith effort to maximize income and minimize
    expenses.
(8) Whether the dominant purpose of the bankruptcy petition was to discharge the student
    loans.
(9) The ratio of the student loan to the total indebtedness.

Morgan v. U.S. Dep't. of Higher Educ. (In re Morgan), 247 B.R. 776, 782 (Bankr. E.D. Ark. 2000)

(quoting, D'Ettore v. Devry Inst. Of Tech. (In re D'Ettore), 106 B.R. 715, 718 (Bankr. M.D. Fla.

1989)).

The DOE and ECMC maintain that these factors militate against a discharge in this case.

They note that the Plaintiff's student loans have almost constantly been in deferment, forbearance

or default, that the Plaintiff failed to take advantage of an ICRP, and that the Plaintiff's schedules

establish that her primary motivation for filing for bankruptcy relief was to discharge her student

loans.   They argue that these factors necessitate a finding that the Plaintiff has not made a "good

faith" effort to repay her loans and therefore has not satisfied her burden under the third prong of

the "totality of the circumstances" test.

## IV.    Legal Standard.

A discharge under § 727 of the Code does not discharge a student loan unless "excepting

such debt from discharge . . . would impose an undue hardship on the debtor and the debtor's

dependents." 11 U.S.C. §523(a)(8).  The creditor bears the initial burden of establishing that the

debt is the type excepted from discharge. Bronsdon v. Educ. Credit Mgmt. Corp. (In re Bronsdon),

435 B.R. 791, 797 (1st Cir. B.A.P. 2010).  Once this initial burden has been satisfied, the burden

shifts to the debtor to prove undue hardship by a preponderance of the evidence.  Id.

As ECMC noted in its papers, courts have developed several tests for determining whether

a debtor has established an undue hardship.  This Court employs the "totality of the circumstances"

test.  Bronsdon, 435 B.R. at 797-798.   While the "totality of the circumstances" test does not

expressly include the "good faith" standard set forth in the Brunner test, both the DOE and ECMC

suggest that a Debtor's good faith should be considered.  This Court does not agree that a "good

faith" requirement should be appended to the "totality of the circumstances" test but acknowledges

that a debtor who has demonstrated bad faith should not be afforded the benefits of a hardship

discharge.

The First Circuit Bankruptcy Appellate Panel has expressed a similar understanding of the

undue hardship standard.   While the BAP found no textual foundation for a "good faith"

requirement in the context of § 523(a)(8), it did state:

> . . . Irrespective of the test, the decision of a bankruptcy court, whether the
> failure to discharge a student loan will cause undue hardship to the debtor and
> the dependents of the debtor under § 523(a)(8), rests on both the economic
> ability to repay and the existence of any disqualifying action(s).   The party
> opposing the discharge of a student loan has the burden of presenting evidence
> of any disqualifying factor, such as bad faith.   The debtor is not required under
> the statute to establish prepetition good faith in absence of a challenge.   The
> debtor should not be obligated to prove a negative, that is, that he did not act in
> bad faith, and, consequently, acted in good faith.

Bronsdon, 435 B.R. at 800.   In other words, a debtor is not required to establish that he or she acted

in good faith, but if a party opposing discharge can establish bad faith, such bad faith may

constitute a disqualifying factor.

## V.   Analysis.

Now, the Court must apply the Bronsdon test to the Plaintiff's facts and will address the

resources and expenses prongs first.

### A. The Plaintiff's Income and Expenses.

As discussed below, the DOE and ECMC contend that the fact the Plaintiff's student loans

have almost constantly been in deferment, forbearance or default evidences her lack of good faith

in repaying those loans.   Aside from this very generalized argument, however, the DOE and ECMC

did not offer any controverting evidence or otherwise challenge the Plaintiff's testimony that her

past financial resources and reasonable expenses prevented her from repaying her student loan

debt while maintaining a minimal standard of living.   Accordingly, this Court finds that the

Plaintiff satisfied her burden under the first and second prong of the totality of the circumstances with respect to her past income and expenses.

The DOE and ECMC do, however, argue that the Plaintiff failed the first and second prongs of the Bronsdon test with respect to her current and future financial resources and expenses. The Court disagrees. Notwithstanding the recent changes in her employment and the small sampling of income generated and expenses incurred during the first few months of the Plaintiff's new career at Crossroads and in private practice, the evidence submitted by the Plaintiff in her supplemental discovery responses and during her testimony at trial was comprehensive, credible and transparent. For the reasons discussed above, the Court is persuaded that the evidence presented by the Plaintiff shows that her current gross monthly income is likely closer to $2,860.80 than the $2,213.39 shown in her amended Schedule I.[7]  After deducting $2,940.00 of expenses shown in amended Schedule J the Plaintiff faces a monthly deficit of $79.20 before accounting for any reimbursements she might owe to Sweetser. Applying such reimbursement to her expenses increases that deficit to approximately $340.00.

Her monthly expenses are far from extravagant (see Section II, D and E *supra*) and the DOE and ECMC do not raise any meaningful challenge to most of them. They objected to two monthly expenses in particular: the $195.00 dog walking charge and the Plaintiff's $319.00 automotive lease. The Plaintiff's testimony concerning the necessity for the dog walking charges was persuasive and convinced this Court that those charges are necessary (see Section II, E, *supra*) and reasonable. The DOE and ECMC also argue that the Plaintiff's monthly automotive lease

---

[7] Although the Court calculates the Plaintiff's gross monthly income differently than did the Plaintiff, her method was reasonable. Moreover, by supplying the underlying data and explaining her calculations, the Plaintiff provided the Court with all of the information necessary to make an independent determination as to her current income. Therefore, while the Court differs in its interpretation of the data, the Plaintiff's credibility remains intact.

payment of $319.00 is more than minimal.  This Court disagrees.  In a state like Maine, with limited public transportation options, a car is a necessity for debtors who work outside of the home, as does the Plaintiff.  The Plaintiff's monthly lease payment for her Subaru amounts to $10.50 per day and does not, on its own, disqualify the Plaintiff for relief under § 523(a)(8).[8]

Based on the foregoing, the Court concludes that the Plaintiff's current income and expenses preclude her from paying any portion of her student loans while maintaining a minimal standard of living.  The Court further finds that the Plaintiff's economic hardship will likely continue into the future.  The Medicare limitations made it difficult for the Plaintiff to find employment as a clinician in the agency setting, so, reasonably enough, she ventured into private practice to augment her income.   Her private practice has shown potential for viability, but just how much and how fast the Plaintiff can expect her financial health to improve is subject to question.  Notably, the Plaintiff testified that she expects it will take between three and five years to fully develop her practice.  This uncontroverted testimony is supported by the trajectory of her earned income during her first six months in private practice.  Thus, the Plaintiff will be somewhere between sixty-seven and seventy years old before her practice is fully established.  Based on these projections, it is unlikely the Plaintiff has sufficient working years remaining to substantially improve her financial condition for a sustained period of time.  Further, even when "fully established," the practice will likely, for at least the foreseeable future, continue to face the same regulatory limitations currently capping the Plaintiff's earning potential.  Those limitations include Medicare reimbursement restrictions, lower reimbursement rates and a curtailment of programs.

---

[8]  Although not determinative of whether the Plaintiff's monthly lease payment is a minimal expense, the Court finds it interesting that according to the standards that the Internal Revenue Service uses to calculate the amount a delinquent taxpayer can afford to repay, the IRS deems that $485 per month is allowed to be deducted from a taxpayer's gross income as a necessary expense for the ownership or lease costs of an automobile. https://www.justice.gov/ust/eo/bapcpa/20171101/bci_data/IRS_Trans_Exp_Stds_NE.htm.

The Plaintiff's uncontroverted testimony established that, while there is a constituency fighting to change these restrictions, there is no indication that those restrictions will be relaxed in the near future.

For these reasons, the Court finds that the Plaintiff has met her burden under the first two prongs of the Bronsdon test.  She cannot, based on her current income and expenses, maintain a 'minimal' standard of living if she is required to repay her educational loans to the DOE and ECMC and that her financial condition is likely to persist for a significant portion of the repayment period of her loans.

      *B.*     *Medical Testimony.*

The Plaintiff argues that her ability to generate income is negatively impacted by her hearing impairment.  Specifically, she testified that she has been diagnosed with bilateral severe and profound hearing loss, that the condition is progressive in nature, that her hearing will continue to deteriorate, that her hearing loss makes it difficult to communicate on the phone, that she requires the use of adaptive hearing equipment[9], and that she has trouble treating clients who mumble or slur or who have facial hair.  She did not call any medical experts to testify or offer other corroborating evidence to support her testimony regarding either the diagnosis or prognosis.

The DOE and ECMC argue that the Plaintiff's failure to present any expert testimony or other corroborating evidence precludes this Court from considering the Plaintiff's alleged hearing impairment.  Specifically, the DOE and ECMC argue that "numerous courts, including courts in the First Circuit have embraced the rule that substantial and credible evidence must be presented for a debtor to sustain her burden of proof regarding an asserted medical condition." Joint Pre-Trial Memorandum at 10. As support, the lenders cite to Burton v. Educ. Credit Mgmt. Corp. (In

---

[9] The Plaintiff used such equipment during her testimony.

re Burton), 339 B.R. 856 (Bankr. E.D. Va. 2005) which, they say, canvasses case law adopting the

"overwhelming weight of authority" requiring corroborating medical evidence.  In so arguing,

however, the DOE and ECMC overstate the persuasive value of the collected authority.

Regardless of whether courts employ the "totality of the circumstances" test or the Brunner

test, the inquiry under § 523(a)(8) is factually intensive and, in that vein, the determination as to

the necessity of corroborating medical evidence depends on any number of factors, such as the

nature of the condition, the impact that condition has on the debtor's earning potential and the

specifics of the debtor's own testimony regarding the condition.  See, e.g., Nash v. Conn. Student

Loan Found. (In re Nash), 446 F.3d 188, 193 (1st Cir. 2006) (carefully limiting its holding to the

specific facts presented by the case:  "The specific question we face is whether, on this record,

where the illness is bipolar disorder, where we have no prognosis from treating physicians or other

experts, where the testimony of appellant herself as to the future is necessarily speculative, the

bankruptcy court supportably found that appellant had not carried her burden of proving a

sufficient likely future period of unemployability.").

Burton, and all of the cases cited by that decision, including the two cases which the DOE

and ECMC also individually cite, are factually distinguishable from the Plaintiff's case.  Burton,

339 B.R. at 879-881 (forty-four-year-old debtor suffering from bipolar II disorder did not establish

that his mental illness negatively impacted his ability to generate income where he presented no

corroborating evidence beyond his own testimony); Kelsey v. Great Lakes Higher Educ. Corp. (In

re Kelsey), 287 B.R. 132, 144 (Bankr. D. Vt. 2001) (granting a hardship discharge to a fifty-five-

year-old debtor suffering from complex mood disorder, seasonal affected disorder, major

depressive episodes and bipolar mood disorder where testimony by the debtor and her medical

professionals "persuaded the Court that her prior, current and reasonably anticipated future

17

minimal standard of living are not machinations, self-serving or self-imposed for personal gain, but rather are credibly presented and documented, and her disability is involuntary and severe, thereby warranting the requested relief"); Tirch v. Pa. Higher Educ. Assistance Agency (In re Tirch), 409 F.3d 677, 681-682 (6th Cir. 2005) (debtor in mid-forties did not provide a credible explanation as to how irregularity and loss of taste resulting from colorectal surgery prevented her from working in the counseling profession, and further failed to provide any evidence to establish that these conditions, as well as stress from her experiences as a social worker, would persist for any significant period of time); Rose v. Educ. Credit Mgmt. Corp. (In re Rose), 324 B.R. 709 (8th Cir. B.A.P. 2005) (debtor did not even allege a mental or physical disability); Pobiner v. Educ. Credit Mgmt, Corp. (In re Pobiner), 309 B.R. 405, 419-420 (Bankr. E.D.N.Y. 2004) (forty-three-year-old debtor's testimony insufficient to establish that his attention deficit hyperactivity disorder precluded him from generating sufficient income to repay his student loans where debtor testified that he is receiving psychotherapy and is taking medication and the debtor did not exhibit signs of hyperactivity during trial); Burkhead v. Educ. Credit Mgmt. Corp. (In re Burkhead), 304 B.E. 560, 565-566 (Bankr. D. Mass. 2004) (thirty-four-year-old debtor did not sufficiently establish that endometriosis prevented her from earning sufficient income to repay her loans where her symptoms appeared to be under control at trial and she testified that they can be controlled by medication); Pace v. Educ. Credit Mgmt. Corp., (In re Pace), 288 B.R. 788, 793 (Bankr. S.D. Ohio 2003) (forty-six-year-old debtor working as a writer of service proposals denied hardship discharge based, in part, on failure to provide corroborating evidence of hearing impairment, bipolar condition, Hepatitis C, bleeding ulcers, fibromyalgia, and alcoholism; "While the Court is sympathetic to the condition of the Plaintiff, and it appears that there is some hearing impairment, there is no basis in the record for this Court to conclude that this or any other condition truly

impairs her earning potential for the repayment period of the student loans"); Garrett v. New Hampshire Higher Educ. Assistance Found. (In re Garrett), 180 B.R. 358, 364 (Bankr. D.N.H. 1995) (debtor did not meet burden to establish that tuberculosis, rosacea and multiple sclerosis prevented her from earning sufficient income to repay her loans where correspondence from doctors did not include work restrictions and did not conclusively diagnose the debtor with multiple sclerosis); Daugherty v. First Tennessee Bank (In re Daugherty), 175 B.R. 953 (Bankr. E.D. Tenn. 1994) (fifty-three-year-old debtor did not establish inability to work where she testified that her doctors urged her to return to work).

The most obvious distinction between the Plaintiff and the debtors in the cases cited above is age.  The Court does not need expert medical testimony or corroborating evidence to establish that, as one ages, it becomes increasingly unlikely for an existing hearing impairment to substantially resolve.  Unlike the Plaintiff, many of the debtors in the cases above suffered from conditions which can be treated or managed with medications and, in many cases, it was not readily apparent how the medical condition asserted by the debtors impacted their ability to earn income.

So, in response to the DOE and ECMC's request that this Court reject any testimony by the Plaintiff as to her hearing problems, this Court is not prepared to adopt a bright line test that only a medical expert can provide valid evidence about a debtor's physical, emotional or medical condition in the context of determining the dischargeablity of student loans.  This Court agrees that the Plaintiff is not qualified to testify as to either her diagnosis or her prognosis and therefore affords no weight to her testimony on those issues.  However, the Court does find that the Plaintiff can, and did credibly, testify that she has difficulty hearing and, further, that this impairment makes it difficult to communicate with some individuals.  This testimony, coupled with her age and the nature of her condition, is sufficient to establish that the Plaintiff suffers from a hearing condition

19

that negatively impacts her capacity for earning and, further, that this condition is unlikely to be remedied in sufficient time to afford her a meaningful period of time during which to generate sufficient income to maintain a minimal standard of living while making payments on her student loans.

Although the Court finds, on this record, that the Plaintiff met her burden to establish the existence of a hearing condition without providing expert medical testimony or other corroborating evidence, the Court's decision to grant a hardship discharge in this case does not turn on this determination. The Plaintiff's current financial condition and her future economic prospects are sufficient to establish the propriety of a discharge under § 523(a)(8) without even considering the challenges presented by her hearing impairment.

C.       *Other Circumstances.*

Finally, the analysis now turns to whether there are other relevant facts unique to this case which prevent the Plaintiff from paying her student loan obligations to the DOE and ECMC while still maintaining a minimal standard of living.   The DOE and ECMC point to a variety of "other circumstances" which they assert prevent the Plaintiff from obtaining a discharge under § 523(a)(8).  First, they point to the Plaintiff's failure to explore any ICRP options under the William D. Ford Federal Direct Loan Program as evidence of her lack of a good faith effort to repay her loans.  This Court joins others in refusing to adopt a per se requirement that a debtor enroll in an ICRP before seeking a hardship discharge under § 523(a)(8).  *See* Barrett v. Educational Management Credit Corp. (In re Barrett), 487 F.3d 353, 364 (6th Cir. 2007); Educational Management Credit Corp. v. Mosley (In re Mosley), 494 F.3d 1320, 1327 (11th Cir. 2007).  There is nothing in the Code or in controlling law that requires it.

Second, pointing to the factors enumerated in <u>Morgan</u>, the DOE and ECMC argue that the ratio of the student loan debt to the total indebtedness demonstrates that the Plaintiff's dominant purpose in commencing her bankruptcy case was to discharge her student loans. This Court refuses to deny the Plaintiff a hardship discharge simply because the relief provided under § 523(a)(8) motivated her, in part, to file her case. While the student loan debt comprised a large share of the Plaintiff's debt, her schedules included a number of medical and credit card debts which are sizeable in light of her meager income. She sought bankruptcy relief for a lawful purpose and the scope of relief available to her will not be curtailed simply because she has significant student loan debt in comparison to her other obligations.

To the extent the DOE and ECMC suggest that the Plaintiff's decision to return to school for her graduate degree and her later decision to leave MBH to accept a position at Crossroads and open her own private practice demonstrate a lack of good faith effort by the Plaintiff to repay her student loans, the Court disagrees. It is true that by enrolling in graduate studies the Plaintiff incurred additional student loan indebtedness at a time when she was already in default on her undergraduate loans. However, the record reveals that she searched, unsuccessfully for regular employment for at least a year prior to returning to school and that, after she received her graduate degree, she quickly found employment. Although the Plaintiff has not generated enough income to repay her student loans following her graduate studies, she has managed to secure steady employment. Similarly, the Plaintiff's recent career changes seem to have resulted in a modest improvement in her overall financial health while simultaneously providing her with an opportunity to work in her area of study. These educational and career decisions do not demonstrate bad faith or irresponsibility. The Plaintiff impresses the Court as a hardworking woman who chose an area of study which, due to changes in federal laws and regulations, proved

less profitable than she anticipated.    If the Court applied such stringent standards to all student

loan challenges, anyone who failed to correctly read the tea leaves of the future and incurred

student debt in an area that technology, societal preferences, or legislation later made obsolete

would be ineligible for a discharge.  The Code simply does not go that far.

Finally, the DOE and ECMC likewise argue that this Court should consider the fact that

the Plaintiff's loans have almost consistently been in forbearance, deferment or default as evidence

of the Plaintiff's bad faith.  Despite this assertion, neither the DOE nor ECMC challenged the

Plaintiff's testimony that she struggled to find full time work until 2002 or that, from 2002 until

2008, she did not generate sufficient income to maintain a minimal standard of living and repay

her student loans.  Accordingly, the Court finds that the Plaintiff's failure to make any meaningful

payments on her student loans is the result of her meager income and not evidence of bad faith.

## VI.    Conclusion

Every decision regarding the dischargeability of student loans rises or falls on the unique

facts of the case.  Here, the Plaintiff offered credible and uncontroverted testimony that she initially

borrowed money to pursue a particular career and when that path was not lucrative enough to repay

her then-existing loans and support her expenses, she applied to graduate school.  Following

graduation from her graduate program and after working for various agencies for six or so years,

she sought to supplement her income by opening her own counseling practice.  Nonetheless,

despite working five to six days per week, the Plaintiff can barely fund her own minimalist

lifestyle.  Her age and her professional trajectory belie any notion that she will be able to generate

sufficient income in the coming years to repay her student loans while maintaining that minimal

standard of living.  Given this, the Court concludes that the Plaintiff has met her burden under §

523(a)(8) to obtain a discharge of her educational loans to the DOE and ECMS.   A separate order

discharging her student loan obligations and issuing judgment in her favor will enter.